Statement of Facts.

## COUNTY OF NORTHAMPTON v. LAFAYETTE COLLEGE.

ERROR TO THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY.

Argued March 12, 1889—Decided October 7, 1889.
[To be reported.]

1. Buildings owned by an incorporated college, located on the college grounds, and occupied as residences by persons employed in carrying on the proper work of the institution, such as instructors, the secretary of the president, or a gardener having charge of the property, are embraced in the exemption from taxation granted to. colleges by the act of May 14, 1874, P. L. 158.

2. An incorporated college whose charter provides that persons of every religious denomination shall be eligible as trustees; that no person shall be refused admission into its faculty or classes, or denied participation in any of its privileges or advantages, on account of religious belief; and that it shall be subject to visitation by the state, is a public institution in the broadest sense of the word.

3. Such an institution, if founded, endowed and substantially maintained by charity, is a purely public charity, and as such within the protection of the act of 1874, granting exemption from taxation, notwithstanding that a small portion of its annual expenses may be paid by tuition fees received from its students: Thiel College v. Mercer County, 101 Pa. 530, and Institute of Science v. Delaware County, 94 Pa. 163, distinguished.

Before STERRETT, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 148 July Term 1888, Sup. Ct.; court below, No. 20 February Term 1888, C. P.

On December 30, 1887, a case was stated and filed, wherein the county of Northampton was plaintiff, and the Trustees of Lafayette College were defendants, and showing the following facts:

That " The Trustees of Lafayette College " above named is a corporation incorporated by the legislature of. the state of Pennsylvania by act approved by the governor thereof, on March 9, 1826, P. L. 76, and the several supplements thereto: Acts of April 7, 1832, P. L. 376; March 11, 1834, P. L. 107.

That the said the Trustees of Lafayette College were created a body corporate for the purpose of erecting, establishing and conducting a college to be called Lafayette College, for the education of youth in the various branches of science and literature, the useful arts, and the learned and foreign languages.

That the said act incorporating the Trustees of Lafayette College provides, among other things, " that persons of every religious denomination shall be capable of being elected trustees, nor shall any person, either as principal, professor, tutor or pupil, be refused admittance into said college, or denied any of the privileges, immunities or advantages thereof, for or on account of his sentiments in matters of religion.

That the said the Trustees of Lafayette College organized under the act of incorporation and erected by voluntary donations and contributions a college building for the purposes authorized and described in the said act of assembly incorporating the said defendant corporation.

That the said the Trustees of Lafayette College at different times by voluntary gifts, grants and donations given to them by divers persons for that specific purpose and for that only, have extended, enlarged and increased the buildings and educational facilities and the means used for the purpose of education authorized by the said act of incorporation. That buildings have been erected by divers persons which, when completed, have been granted to the said defendant corporation for the educational purposes of the college by the persons erecting them.

That no distinction is made in the admission of students on account of their religious belief, nor are the students confined in the worship of God to any form of any particular church, but are permitted to worship and attend church according to their individual desires.

That a tuition fee of $45 per annum is charged in the classical and general scientific courses, and $75 in the technical courses, to all students who are able to pay the same; but where the said defendant corporation is satisfied that any student is unable to pay the same, then no charge is made for tuition, and such student is taught and has full and complete access to and advantage of all the educational facilities and means, to the same extent as if he had paid the tuition fee.

Statement of Facts.

That at all times since the creation of the said corporation there have been, and still are a number of students, about one half of the entire number in attendance upon the said college, who received their tuition gratuitously without the payment of any money, fee or reward therefor.   The present number of students receiving free education is one hundred and upwards.

That the said defendant corporation has an invested fund of $112,000, which yields them an annual revenue of about $5,600, all of which they received as voluntary gifts, grants, donations and contributions from divers persons, upon condition that the income thereof should be devoted solely to educational purposes of the said college, the said revenue or interest being expended in the education of the students attending said college, and the maintenance of the buildings.   That the said tuition fees, received from the students in attendance upon the said college, amount to about $7,000 per annum.

That the said defendant has expended in the payment of instructors engaged in teaching the students in said college, during the last several years, about $25,000 per annum.   That each student is charged a certain fee for the general expenses of the college, viz.: janitor's services, light, fuel, etc., in and about the hall, recitation rooms, libraries, museums, chemical laboratories, etc., which amount to about $6,000 per annum. That the defendant corporation has expended for general expenses, viz.: light, heat, fuel, janitor's services, labor and other expenses, incident to and necessitated by the presence of the students at the said college, during several years last past, about $15,000 per annum.

That the expenditures of the defendant corporation for tuition and general expenses have exceeded its income from the interest on its invested fund, tuition fees and contributions from the students toward the payment of the general expenses for several years last, by about $15,000 per annum, which annual deficiency has been made up by the voluntary contributions of divers persons for that purpose.

That the said defendant corporation has the title in fee simple to real estate located in the Third ward of the borough of Easton, in Northampton county, as follows, viz.: Fifteen acres of land upon which the college buildings are erected and which are used in connection therewith; a main college building in

which are the chapel, library, recitation rooms, dormitories of students; Pardee Hall, a building containing recitation rooms, oratorial hall, museum, apparatus for instruction in mechanics, mineralogy, and civil and mining engineering; West College Office, in which are located the treasurer's office and other offices for the transaction of the business of the defendant corporation, and the lecture room of the professor of philology; an astronomical observatory, a building used for the teaching and study of astronomy; Jenks' Hall, a building used for the teaching and study of chemistry; McKeen Hall; Martien Hall; Powell Hall; Blair Hall; Newkirk Hall and East Hall, buildings erected and used as dormitories by the students in attendance upon and studying at said Lafayette College.

That in addition to the real estate above stated, the said defendant corporation is also seized in fee of the following real estate, located in the said Third ward of the borough of Easton, viz.: Ten dwelling houses which are occupied by the professors who are engaged in teaching the students in attendance upon and studying at said Lafayette College, the said dwellings being occupied by the said professors upon condition that they shall receive in payment of their services as instructors $1,600 and the right to occupy one of said houses, or $2,000 and they reside elsewhere than in one of said dwellings. That the said defendant corporation is also seized of a dwelling house occupied by R. Meissner, the gardener having charge of the college grounds, and who is employed in the care thereof by the defendant corporation; the house being furnished him in connection with his duties in, upon, and about the grounds of the said college, and in which he is obliged to reside by the terms of his employment. No income is derived from any of these houses other than above stated. That the said defendant corporation is also seized of five vacant lots which adjoin the grounds of the college, and which are held for the purpose of erecting buildings upon them for college purposes. No income is derived from these lots. That the said defendant corporation is also seized of a dwelling house occupied by C. J. Savitz, who is employed as secretary of the president of the college, and who at the time of his employment as such secretary, was promised the occupancy of said building in part consideration of his services.

That the whole of the real estate hereinbefore described, and all of which is in one general inclosure, except the president's house, was purchased for the said college by moneys donated voluntarily by friends of the cause of education for that purpose; and all of it is in the use and occupation, and is necessary for the uses of the college in the opinion of the trustees. A plan of the real estate belonging to the college is hereto annexed and made part of this case stated.

That the house known as the president's house was a gift to the defendant by John I. Blair, Esq., a trustee of the college, with the intention that it should be occupied by the president of the college faculty. That it was so given in 1884 and was rented for the annual rent of $550, which is applied to the payment of the salaries and other expenses of said college.

That the houses in schedule A., occupied by the professors, were erected with money donated to the defendant by friends of education, and was originally invested in bonds and mortgages. But it was thought expedient that the instructors should have dwelling houses near to the college buildings, and the present dwellings were erected with moneys donated and invested as aforesaid, and the occupancy counted as part of the salaries of the professors.

That by § 4, act of April 12, 1838, it was provided that the sum of $1,000 should be paid annually to each college maintaining at least four professors, and instructing constantly at least one hundred students.

That the said lands, buildings and improvements have been assessed in the last assessment of the Third ward of the borough of Easton, as taxable for county purposes, as follows:

\*          \*          \*          \*          \*          \*          \*          \*

If the court shall be of the opinion that the real estate described in Schedule A. is taxable for county purposes, then judgment to be entered in favor of the plaintiff for the sum of $105.14 with costs of suit. If the court be of opinion that only a part of the said real estate is taxable for county purposes, then judgment to be entered for the plaintiff for . . . . . upon the valuation thereof as stated in schedule A. If the court shall be of the opinion that the said real estate is not taxable for county purposes, the judgment to be entered in favor of the defendant.

This case to be in the nature of a special verdict and subject to a writ of error.

On June 4, 1888, after argument, the court entered judgment for the defendant, the court, SCHUYLER, P. J., REEDER, J., concurring, filing the following opinion:

Although the fact is not expressly admitted in the case stated, we do not understand it to be seriously denied that the defendant corporation is "an institution of purely public charity," within the second section of the ninth article of the constitution, or that it is a "college . . . . . endowed and maintained by public or private charity," within the scope and meaning of § 1 of the act of May 14, 1874, P. L. 158. Indeed, it is an open secret that the plaintiff has acted upon this theory, by declining to levy a tax upon the buildings of the defendant that are used for imparting instruction and as dormitories for the students. Under such circumstances it will hardly be expected that we should enter into a discussion of the subject. In any event, such a discussion at this time would be the merest affectation, after the careful, able and exhaustive opinion of Judge WILLSON in Academy v. Hunter, 20 W. N. 100, a case in its essential features on all fours with the present in this aspect of it.

Now, the section of the act of assembly above referred to provides that "all colleges . . . . . with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity . . . . . be and the same are hereby exempted from all and every county . . . . . tax." Notwithstanding this act of assembly, the plaintiff claims the right to tax for county purposes certain property belonging to the defendant, as follows: Ten dwelling houses, occupied by the professors in the college; one dwelling house occupied by the college gardener; one dwelling house occupied by the secretary of the president of the college; five vacant lots; and the president's house. The property last named was donated to the defendant specifically as a residence for the president of the college, although at present it is not so used, but it is rented to a stranger to the college. From a draft which is made part of the case stated, it appears that all these dwellings are erected on the college

grounds, said grounds being in one body and in one general inclosure, except that the ground on which the president's house stands, and the adjoining ground owned by the defendant, are intersected by a public street. By the terms of the case stated, if the plaintiff has a right to tax any part of the property marked out for taxation as above stated, then judgment is to be entered for plaintiff; otherwise for defendant.

It will be noticed that what the act of assembly exempts from taxation in the first instance, are not lands or buildings, but "colleges." What is meant by the term "colleges," as here used, for the term has a various signification? The act itself throws but little light on the question, and there are no decisions, it is believed, in our own state on the subject. The question, however, has received careful consideration in our sister state of New Jersey, in the case of State v. Ross, 24 N. J. L. 498, the question in that case arising under an act of assembly which exempted from taxation " all colleges, academies, or seminaries of learning."

" The term ' college,' as here used," says HAINES, J., in the case just mentioned, " is not to be taken in its general sense, and as signifying an assemblage of persons for any political or ecclesiastical purpose ; but in its more usual acceptation, a college of learning. Nor in that sense does it mean the assemblage of professors and students ; nor yet the trustees in their corporate capacity ; but certain property belonging to them, edifices, and the land whereon the same are erected. The question then arises, what buildings and lands are included in that term? If it be limited to such buildings as are indispensable to a seminary of learning, their dormitories and refectories must be excluded, for they are not essential, and we know of one in our state which is in successful operation without either. If the term be not confined to the mere lecture or recitation rooms, then it must be so construed as intended to include everything necessary to the proper management of the institution." This language derives additional significance from the fact that the very point decided in State v. Ross was, that " the dwelling houses erected by the College of New Jersey, for the accommodation of the professors and steward, are exempted from taxation."

But our act of assembly is much broader than the New

Jersey act, in that it exempts not merely " colleges," but also " the grounds thereto annexed and necessary for the occupancy and enjoyment of the same." That the grounds on which the buildings in controversy are erected, are necessary for the occupancy and enjoyment of the college, is free from all reasonable doubt, bearing in mind that the word " necessary," as used in jurisprudence, imports not an absolute, but a reasonable necessity. " A power," says BEASLEY, C. J., in State v. Hancock, 35 N. J. L. 546, " which is obviously appropriate and convenient to carry into effect the franchise granted, has always been deemed a necessary one." So in McCullough v. Maryland, 4 Wheat. 414, Chief Justice MARSHALL says, speaking of the term " necessary " : " Does it always import an absolute physical necessity so strong that one thing, to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use in the common affairs of the world, or in approved authors, we find it frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means without which the end would be entirely unattainable."

Let us apply the tests furnished by these citations to the facts before us. What are these facts? The defendant was incorporated in the year 1826 as " a college for the education of youth in the various branches of science and literature, the useful arts and the learned and foreign languages." By the charter, a board of trustees was created with the right of perpetual succession, and with power to take to themselves, for the use of the college, any estate in lands by gift, grant or otherwise ; to transact all business touching the same as fully as if they were natural persons, and generally to enjoy and exercise all such authority and jurisdiction as are customary in other colleges. The charter also provides for " a principal and professors," to constitute the faculty of the college, whose duty it is made to enforce " the rules and regulations adopted by the trustees for the government of the students."

In this connection we quote again from the opinion of Judge HAINES, as follows : " Government was regarded as co-ordinate

with education, and indispensable alike to the success of the enterprise, to the prosperity of the institution and to the welfare of the youth.   To enable the officers to exercise the proper discipline, it was necessary that they should dwell in the proximity of the students, and be provided with apartments either in the same buildings with them, or in dwelling houses adjacent.   It was neither agreeable nor proper that the president and professors, with their families, should be required to dwell in the same buildings with the students ; and therefore the trustees deemed it needful and convenient to provide separate houses for them . . . . . The providing of these dwellings was clearly within the scope of the authority given by the charter, and they are to be taken as a part of the college, and, together with lands whereon they are erected, must be considered to be within the exemptions of the act."

We think the same is true of the president's house.   The argument that this house should be taxed because a revenue is derived from it, is based upon the proviso of the act of 1874, above referred to, which reads as follows : " Provided, That all property, real and personal, other than that which is in actual use and occupation for the purposes aforesaid, and from which an income or revenue is derived, shall be subject to taxation." But this proviso has been declared unconstitutional: Sewickley Bor. v. Sholes, 118 Pa. 165.   The act must therefore be read without it, which leaves the president's house upon the same footing with the professors' houses, and the same test must be applied, viz., whether such a house is necessary.   The true criterion it seems to us is, whether a president's house on the college grounds is necessary, and whether the present house has been provided in good faith, and not merely to cover up the college funds from taxation.   The good faith of the trustees is not questioned, and upon the basis of necessity if, as we think has been shown, professors' houses are necessary, it goes without saying that a house for the president is necessary.   Assuming then as a general proposition that a president's house is a necessary part of the plant of every well regulated college, the fact that the particular house in question is for the time being occupied by a stranger can make no difference.   In fact it does not appear from the record that during the time it has been thus occupied, the college has had a president, and in

that event the fact that the house has been temporarily occupied by another would be clearly immaterial. Nor is it material that the present occupant pays a rental, the proceeds being applied not for private gain, but towards making good an ever existing deficit. As is said in Philadelphia v. Trustees, 44 Pa. 362, this "is merely an internal arrangement" which works injustice to no one.

It remains briefly to consider the question of necessity in its application to the gardener's dwelling, the dwelling of the president's secretary, and the five vacant lots. The duty of the gardener is to take care of the college lawns, which are things "of beauty and a joy forever." Who that has seen these lawns, whether in spring, summer or autumn, will say that they are not necessary? As is well said in the very full and excellent brief of the learned counsel for the defendant, "the campus with its beautiful verdure and flowers is itself an educator and refiner. And in order that it may be kept in proper order, the gardener should be on the spot in the midst of his work, and his house is there for this purpose." If a secretary to the president be necessary, the secretary should certainly live near to the president. Whether a secretary is necessary or not, clearly the trustees are the best judges. In State v. Ross, supra, it is decided that a steward's house connected with a college is exempt from taxation, upon the ground that it is a constituent part of the college. We can see no good reason why a gardener's house and a secretary's house should not be exempt on the same principle.

As to the vacant lots, it appears from the case stated that they are in the same general inclosure with the other real estate of the defendant; that they are in the use and occupation of the college; and that in the opinion of the trustees they are necessary for the use of the college. No one says that they are not necessary, and if necessary, of which as intimated above we think the trustees are the best judges, then they are exempt from taxation. The conclusion reached is that none of the properties mentioned in the case stated owe any tax to the plaintiff, and by the terms of the case stated judgment must be entered for the defendant.

Judgment having been entered as directed, the plaintiff thereupon took this writ, specifying that the court erred:

Arguments.

1. In entering judgment for the defendant.
2. In not entering judgment for the plaintiff.

*Mr. H. S. Cavanaugh*, for the plaintiff in error:

1. That Lafayette College is not such an institution of purely public charity as is contemplated by the provisions of the act of May 14, 1874, P. L. 158, passed to carry into effect § 1, article IX. of the constitution, is too plain to admit of argument. The facts presented by the case stated are not nearly so strong as those shown in Miller's App., 10 W. N. 168. Nor can Miller's Appeal be distinguished on an alleged ground that the buildings referred to in that case were used as convents, for the undisputed facts showed that they were designed and erected for schools and had been used for educational purposes purely. Moreover, the charter in that case described the institution as one of purely public charity, founded, endowed and maintained for the instruction and education of the young.

2. The case stated discloses the fact that this college enjoys an annual income of $13,000, derived from tuition and other fees paid by the students, and it is clear from the context that the college could not be maintained a single year without this source of revenue. How then can it be said to be maintained by public or private charity within the meaning of the act of assembly? All doubts upon this subject are set at rest by the opinion of Mr. Justice STERRETT in Hunter's App., 22 W. N. 361 (1 Mona. 1). As the county has never sought to tax the college buildings and campus, worth at least half a million dollars, there is no good ground for complaint of hardship in the laying of an assessment of $37,500 on the dwelling houses of the instructors and president, and the lots, located near the campus, which could be readily converted in the market.

*Mr. George Junkin* and *Mr. Edward J. Fox* (with them *Mr. Edward J. Fox, Jr.*), for the defendant in error:

1. The argument of plaintiff in error rests wholly upon Miller's Appeal, 10 W. N. 168, and Hunter's App., 22 W. N. 361. In the former case no opinion was given, but the facts are so patent that the grounds of the decision need not rest on a mere guess. We have these grounds in Hunter's Appeal, set forth in the well considered opinion of STERRETT, J,, and they were

the same in both cases. It is manifest that in each of these cases, as well as in Thiel College v. Mercer Co., 101 Pa. 530, the institutions of learning were really mere private schools, conducted for profit, in which charity was a mere incident, not the rule.

2. The facts set forth in the case stated demonstrate that Lafayette College is and always has been a pure charity. Tried by the standard laid down in Donohugh's App., 86 Pa. 313, it is a public charity. It is open to all students, of any age, color or denomination. Its object is pursued only for the public purpose, without intermixture of private or individual gain. All its property was given to it for the public use, and year by year it receives thousands of dollars from charitably disposed persons, supplying the deficiency in its income to meet its expenses. At least half of its students, on the average, are furnished a free education. It was partly founded by the state and is subject to its visitation. If ever there was a purely public charity, this is such.

3. The main buildings of the college have thus far been considered by the taxing authorities as exempt, and the real question in the case is whether the houses occupied by the president, professors, secretary and gardener, and certain vacant lots, are liable to be taxed. The act of May 14, 1874, P. L. 158, putting no limit as to the number of acres, enlarges the exemption given by the prior law as contained in § 3, act of July 2, 1839, P. L. 578, which shows the liberal purpose of the legislature, and the act must be construed in this liberal spirit. That these houses should be erected and occupied as they are, was considered by the trustees necessary for the most useful and efficient work of the college. Who has the right to question their judgment? The necessity called for by the act is not an absolute one; it means merely a necessity for the best conduct of the college in the bona fide and not unreasonable judgment of those having the management of the charity.

4. These houses and the vacant lots are all in the actual use and occupation of the college and those persons whom it employs to carry on its charitable business, yielding no revenue. They are part of the plant of a great public charity, and are exempt under the act: Philadelphia v. Trustees, 44 Pa. 360; Taxation App., 1 Phila. 420; Canal Co. v. Commissioners, 15

Pa. 351; Railroad Co. v. Berks County, 6 Pa. 75; Lehigh etc. Co. v. Northampton Co., 8 W. & S. 334; Schuylkill Nav. Co. v. Berks Co., 11 Pa. 202; Northumberland Co. v. Railroad Co., 8 Cent. R. 531. Church of Our Saviour v. Montgomery Co., 10 W. N. 170, does not touch the question in this case. Moreover, in Sewickley Bor. v. Sholes, 118 Pa. 165, the proviso to the act of 1874, imposing taxes on what was not before taxable, was held unconstitutional. In the present case, as these houses and lots were not taxable by any law existing prior to 1874, they cannot now be taxed. The obiter dicta of GORDON, J., in Thiel College v. Mercer Co., 101 Pa. 530, were partly based on the proviso to this act, since held unconstitutional.

OPINION, MR. JUSTICE WILLIAMS:

The argument in this case, both in thi urt and the court below, has gone beyond the question rais by the case stated to that of the right of Lafayette College t be exempted from taxation. We will consider first the question presented by the case stated, and then that which has been raised on the argument. The case seems to concede that the college is not taxable, but asserts that the houses occupied by the professors and the gardener are not part of the college or entitled to share in the exemption which is practically conceded to the halls and dormitories. If they constitute part of the college, they are certainly entitled to the same treatment at the hands of the taxing power.

The word "college" is employed in this country to indicate an institution of learning, having corporate powers and possessing the right to confer degrees. Looked at with reference to its educational work, the college consists of the trustees, teachers, and scholars. They make up the membership of the college, and represent its active work. Viewed with reference to its taxability, the college edifice, with the dormitories and other buildings in the same general inclosure, used for the purposes of the school, constitute the college. They are the seat, the home, of the institution, and the place where its educational work is done. Almost without exception, colleges find it necessary to undertake supervision and control of the deportment of scholars and the restraint of the turbulent and reckless. The disciplinary powers are second only in importance to the work

of the class-room. In order to facilitate this, it has been found necessary to place the teachers in close relations with their pupils, and lodge as many of them as possible in or near the dormitories occupied by students. If Lafayette College lodged its whole force of instructors in the halls and dormitories, thereby rendering the erection of several additional ones necessary, it is probable that no question like that under consideration would be raised; but because some of them having families are placed in a separate building in the same inclosure and in close proximity to the halls and dormitories, it is thought the buildings so occupied are not part of the college. But we see no line of distinction and no reason for one. Buildings outside the college grounds are not relieved from taxation because occupied by a member of the faculty, nor are buildings inside the grounds which are leased to strangers; but the buildings owned by the college which are located within the inclosure, whether filled with teachers or scholars belonging to and forming part of the true college, the institution of learning, are part of the seat or home of the institution and protected as such.

We come now to the other and broader question. Is Lafayette College entitled to ask exemption from taxation under the constitution and the act of 1874? That depends on whether it was founded and endowed and is maintained by public or private charity. It appears by the act of incorporation, § 1, art. 8, that "persons of every religious denomination shall be capable of being elected trustees," and that no person, either as principal, professor, tutor, or pupil, can be refused admission into the college or denied participation in any of its privileges, immunities, or advantages, on account of his religious belief. In § 3, it is subjected to visitation by the state government; its books, papers, and all its concerns and transactions may be investigated by the official visitors, and they are to make a detailed report to the governor which he in turn is required to lay before the legislature. The institution is thus seen to be, not a mere sectarian or denominational school, but a secular organization under an act of the legislature, subject to the visitation and control of the state and open as to the membership of its board of trustees, as to its professorships and as to admission to its classes, to all persons. It is a public institution in the broadest sense of the word.

It has received its land, erected its buildings, provided its library and its scientific apparatus with money given to the trustees, except where the donors have in addition to providing the money, superintended its use in the erection of buildings or in the purchase of school equipments, and presented the completed house or the finished machinery or article ready for use. Its permanent fund or endowment was furnished in the same manner. It may be safely affirmed that it was founded and endowed, so far as it has an endowment, by "public or private charity."

How is it maintained? The case stated informs us that the cost of instruction has for several years past been about twenty-five thousand dollars. General expenses, including light, fuel, labor, and similar necessary expenses are put down at fifteen thousand dollars per annum, making a total of forty. thousand dollars per annum. This is paid in the following manner:

| | |
|---|---|
| Tuition paid by students, about . . . . | $7,000 |
| General expenses paid by students, about . | 6,000 |
| Total received from students . . . . | $13,000 |
| From interest on permanent fund . . $5,600 | |
| From miscellaneous items . . . 6,400 | |
| Deficit made up by gifts . . . . 15,000 | |
| Total paid by gifts . . . . ———— | 27,000 |
| | $40,000 |

The case stated also informs us that fully one half of the total number of students in attendance at the college since its foundation, sixty years ago, have not been required to pay tuition, because of their poverty, and that at least one hundred of the present inmates are instructed without charge. It is thus seen that the college is substantially maintained by charity. It is not maintained for profit, or with any hope or expectation on the part of the trustees that it can ever be made self-sustaining, until its friends shall add by. gift to its endowment several hundreds of thousands of dollars. Upon these facts we hold that Lafayette College is a secular not an ecclesiastical institution; that it is subject to the control of the state; that

it is open to all shades of religious opinion, so that neither as trustee, teacher, or scholar does eligibility depend on church membership or religious opinion. It is public in its character, in its objects, in its control, and if a charity, is a purely public one. As to its charitable character, it is clear that it was founded and endowed by charity. This is not questioned, and upon the exhibit made in the case stated it is equally clear that it is substantially maintained by charity. That a small fraction of its annual cost may be paid by tuition fees, is not enough to deprive an institution, substantially maintained by charity, of the protection of the act of 1874. The true question is, on what does this public institution depend for its maintenance? The answer in this case is, almost wholly on the income from its endowments which were a charity, and on the free gifts of its friends.

Thiel College v. Mercer County is cited as authority for a different doctrine, but the assessment in that case was made upon farm land, one horse and two cows. These were no part of the college, although owned by it, and the tax was properly sustained. That case was well decided on its facts, and is authority upon the question that passed under judgment, but no further. The same may be said of the Institute of Science v. Delaware County, 94 Pa. 163. The cases nearest, in the principles involved, to this case are Donohugh's App., 86 Pa. 306, and the Fire Insurance Patrol v. Boyd, 120 Pa. 624, in both of which the elements of a public charity are considered.

The judgment of the Common Pleas is affirmed.