## Lycoming House v. Board of Revision of Taxes

*Harold Bornemann,* for appellant.

*Joseph H. Lieberman,* for board of revision of taxes.

GORDON, JR., P. J., September 14, 1948.—This is an appeal by complainant from the action of the board of revision of taxes in granting partial exemption from taxation to a property consisting of approximately 11 acres, and located on School House Lane west of Wissahickon Avenue in the City of Philadelphia; and

the case was before us on defendant's exceptions to the findings and decision of our Brother Carroll, reversing the action of the board and holding the entire property exempt under The General County Assessment Law of May 22, 1933, P. L. 853, as amended by section 204 of the Act of May 3, 1943, P. L. 158, 72 PS §5020-204. The entire property is assessed for $82,500, and the board exempted approximately 1½ acres of the ground with the buildings situated on it, refusing exemption to the balance of the 11 acres. Expressed in terms of the assessment, the property was exempted as to $22,500, and the exemption refused as to the remaining $60,000.

Defendants filed seven exceptions to the findings, conclusions and decree of Judge Carroll, five of which are formal. Of the remaining two, the first is to the finding that "the grounds annexed to the dwelling house, are an integral part of the institution and are necessary for the occupancy and enjoyment thereof"; and the second is to the conclusion of law that: "The property, consisting of the land and buildings described in the petition for review is exempt from taxation under the aforesaid Act of 1933".

Factually there is no real dispute in the case, and the question resolves itself into whether the board was justified in granting an exemption to a part of the land only, and refusing it as to the rest, because, in its opinion, the unexempted portion was unnecessary to the prosecution of the activities and purposes of complainant charity within the meaning of subsection (c) of section 204 of the act, which exempts from county taxes the property of

"All . . . institutions of . . . charity, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, that the entire revenue derived from the same be applied to the support and to increase the efficiency and

facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose;".

Defendants admit that Lycoming House, a duly chartered charitable corporation, is a purely public charity within the meaning of the Constitution, and is entitled to whatever exemptions from taxation are granted to such institutions by the laws of this Commonwealth. William J. Turner, a member of the Philadelphia bar, who died on December 2, 1943, bequeathed the real estate here in controversy, which had been his private home, together with his entire residuary estate, to this complainant, which he directed to be incorporated under the name of "Lycoming House", for the purpose of maintaining and operating thereon "a retreat or home for aged and needy gentlewomen". On January 22, 1945, a charter was granted to Lycoming House as stated above, by the Court of Common Pleas No. 5; on December 19, 1945, the property in question was conveyed to Lycoming House by the executors and trustees under Mr. Turner's will; and since May 14, 1946, it has been operated exclusively in furtherance of the charitable objects specified in Mr. Turner's will. Without going into a detailed description of the land, we think it will be sufficient for our present purposes to state that the findings of Judge Carroll are amply supported by the testimony, which discloses that Lycoming House is located in a high-class residential section of the City of Philadelphia, and that it is an extensive estate such as one of Mr. Turner's means would naturally maintain as a dwelling. Though not as large and pretentious, perhaps, as many of the homes of people of his means, the dwelling house is a spacious and attractive building of its kind, containing accommodations for approximately six "guests", in addition to the necessary staff of such an institution. It is surrounded by lawns, beyond which, to the rear of the 11 acres that constitute the entire tract, is a

truck garden, or farm, on which vegetables, fruit, and various other products of the earth are produced, and used exclusively in supplying the occupants of the dwelling with seasonal fresh grown food. In addition, a patch of woods is located on the property, through which paths have been laid out for the use and enjoyment of the occupants of the house, and which, also, furnishes some kindling and firewood for the house. The various buildings on the land are such as are suitable to the use to which it is being put.

The entire tract, as thus developed and used by Mr. Turner in his lifetime, constitutes a cohesive unit, or plant, the different parts of which contribute directly and substantially, by their varied activities, to the operation, maintenance and enjoyment of the place as a home in which to live in comfort, happiness and contentment. The whole product of the plant is enjoyed or consumed, in one form or another, by the institution and its inmates, and hence it cannot be fairly said that any part of the 11 acres devoted to this charity is lying fallow or unproductive. It is not for the board of revision of taxes, nor for the court, to question the nature, direction and extent of a charitable donor's generosity, or to attempt, under threat of taxation, to compel a charity to conform in its operations to their ideas of what is necessary or sufficient for the recipients of its bounty. As was said by the Superior Court in United Presbyterian Women's Association of North America v. The County of Butler et al., 110 Pa. Superior Ct. 116: " 'It is not for the courts to substitute their judgment for that of the governing board on the question of what grounds are necessary' " for proper functioning of the charity. Yet the assumption that the legislature intended, by the use of the word "necessary" in the act, to confer such a power upon the board of revision lies at the root of the city solicitor's defense of the board's action in this case, when he asserts, in summarizing his argu-

ment, "that the normal requirements of this charity, caring for elderly gentlewomen, could not envision the use of more than a house with sufficient land about it for light, air and exercise". Such a standard would tend to restrain the charitable impulses of men and place a curb upon their generosity.

We confess to great difficulty in following this reasoning and its obvious implications. In effect, it asks us to determine how many square feet of lawn is sufficient, or "good enough", for the use and enjoyment of "needy gentlewomen", and that more would be an unnecessary extravagance; that such persons do not need a few acres of woods to stroll through and from which to secure kindling and logs to warm and cheer their home and that the fresh products of the garden, or "farm", are more than they have a right to expect or charity to give. Such questions we have neither the power to decide, nor would we be inclined to so hold under the facts in the present case.

The fallacy of defendants' contention springs, it is apparent, from a misconception of the meaning of the word "necessary" as used in section 204 (c) of the act in question. Ordinarily, "necessary" denotes that which is "indispensable", or "such in its nature and conditions that it *must* exist, occur, or be true": Funk and Wagnall's Dictionary. Applied strictly in this sense, most of the property of every charitable institution would be taxable, for only that would be exempt without which a particular charitable activity could not function. Hence it has been uniformly held that the word "necessary", as used in the statute, does not mean an "absolute necessity", but rather a "reasonable necessity", or what is "convenient and useful". Such phrases as these, however, though they substantially approximate the true meaning of "necessary" intended by the legislature, are lacking in certainty and clarity of definition. The ultimate test of the taxability of the real estate of a charity lies in a deter-

mination of the use to which it is being put. If it is being employed as a means of acquiring revenue, or is merely being held as an idle and unproductive asset, it cannot be said to be necessary to the charitable activity, and is not entitled to exemption from taxation. On the other hand, if the property sought to be taxed is actually and principally used in the charitable activity, it is necessary within the meaning of the act, and is exempt. This distinction is clearly drawn by Mr. Justice Mitchell in Contributors to Pennsylvania Hospital v. Delaware County et al., 169 Pa. 305, 308, 32 Atl. 456 in which he said:

"Property which is not used directly for the purposes and in the operation of the charity, but for profit, is not exempt, and the devotion of the profit to the support of the charity will not alter this result. Of this class of cases Am. Sunday School Union v. Phila., 161 Pa. 307, is the exemplar and authority. But property which is used directly for the purposes and in the operation of the charity is exempt, though it may also be used in a manner to yield some return and thereby reduce the expenses: Donohugh's App., 86 Pa. 306; Phila. v. Penna. Hospital, 154 Pa. 9; House of Refuge v. Smith, 140 Pa. 387." See also County of Lancaster v. Y.W.C.A., 92 Pa. Superior Ct. 514; United Presbyterian Women's Association of North America v. The County of Butler, 110 Pa. Superior Ct. 116.

Any interpretation which would permit a property actually used in a charitable work to be denied exemption because the local taxing authorities were of opinion that its use was not essential to the work being done would open the door to arbitrary and discriminatory control of the operation of every charity by the tax collector, and would destroy the uniformity in taxation required by article IX, sec. 1 of the Constitution. No such legislative purpose is to be gathered from the act, and we see no sound reason for reading it into the legislation. The board of revision does not grant ex-

emptions. Its sole function is fact-finding, and, when it has found facts bringing a property within the terms of the exempting act, it merely recognizes the exemption so granted by the legislature.

It may be difficult to wholly reconcile the many cases in Pennsylvania dealing with exemptions granted by section 204 of the Act of 1943. Much of the difficulty can be reconciled, we believe, if it is borne in mind that religious and charitable institutions stand on different footings, because of the language of article *IX*, sec. 1 of the Constitution authorizing legislative exemptions from taxation. This is clearly set forth by Judge Keller of the Superior Court in Parmentier et al., Trustees' Appeal, 139 Pa. Superior Ct. 27, in which it is pointed out that although, in the case of churches, no exemption is granted rectories, parsonages and other incidental buildings contributing in some way to the operation of a church institution, because the Constitution authorizes the legislature to exempt in such cases only the "actual places of religious worship", the authority given as to charities is stated in the broader language of "institutions of purely public charity". This, of course, includes exemption for the entire plant of the institution as it exists, and is employed in administering the charitable purpose: Dougherty v. Philadelphia et al., 139 Pa. Superior Ct. 37.

In Sisters of the Blessed Sacrament, 38 Pa. Superior Ct. 640, decided in 1909, the case principally relied on by defendants, it was held that a charitable corporation organized to promote the education of Indian and Negro children, and to train teachers for that service, is subject to taxation for land owned by it and used solely for tilling and pasturage in order to provide food for the inmates of the institution. It is not entirely clear whether, in that case, the product of the land was used directly or indirectly to provide food for the

inmates. If we assume the latter to have been the case, we think it is distinguishable in many particulars from the case before us. But even if it is not, that case was decided almost 40 years ago, when the timely and proper feeding of pupils by educational institutions as a usual and desirable function of schools was neither generally advocated nor practiced, and hence, is no longer entitled, we think, to be recognized as a binding precedent today. On the basis of the pedagogical philosophy of the day, a decision that the feeding of pupils is no part of the teaching function is understandable. Today, we are satisfied the opposite view would prevail.

However, that may be, the mere teaching of people as a work of charity is manifestly different in its nature and activities from the providing of a home for them. A home embraces all the phases of private living, and the charity established to furnish a home for the needy is performing its charitable work in every department of homemaking in which it engages. A bed to sleep in would be of little use without food to keep the occupant alive and in health to enjoy it. The intangible values of happiness, comfort and the enjoyments of good living are equally essential to the operation of a home. The property of a charitable institution which directly contributes to any or all of the elements of living is indisputably "necessary" for the performance of its functions. Such is the case with respect to the property here in dispute, and the board of revision of taxes was without power to rule to the contrary.

It was for the foregoing reasons that we dismissed defendants' exceptions, and sustained the findings and conclusions of our Brother Carroll in this case.